UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| CLINTON LEWISON and BEVERLY LEWISON, | ) ) ) | CIV. 13-4031-KES |
| Plaintiffs, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) ) | |
| WESTERN NATIONAL MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

Defendant, Western National Mutual Insurance Company, moves for summary judgment on plaintiffs' bad faith claims. Plaintiffs, Clinton Lewison and Beverly Lewison, resist the motion. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Clinton and Beverly Lewison were involved in an automobile accident with Alexander West on August 24, 2010. West was entirely at fault because he ran a stop sign. The Lewisons were insured by Western National, and Western National received notice of the accident that same day.

I.    **Injuries**

Although the Lewisons did not go to the hospital immediately after the accident, they both sought out medical care shortly thereafter. On August 25, 2010, Clinton went to Sanford Clinic and was seen by Dr. Jeffry Meyer. His chief complaints were aching pain in his neck, mid-back, low back, and right shoulder. After an examination, Dr. Meyer recommended physical therapy. Clinton began physical therapy on October 13, 2010, and continued until January 13, 2011, at which time his physical therapist discharged him because she felt he had progressed as far as he was able.[1] The physical therapy focused on Clinton's knee, shoulder, back, hip, and neck pain.

In addition to physical therapy, Clinton also received chiropractic care. His first appointment after the accident was on August 27, 2010, when he was seen by Dr. Craig Sauer at Empire Chiropractic. Clinton complained of left knee pain, hip pain, buttock pain, and headaches. Clinton treated with Dr. Sauer thirty-nine times until March 15, 2011.

Although he was receiving physical therapy and chiropractic care, Clinton's knee pain persisted. On December 22, 2010, Clinton met with Dr. Timothy Walker

---

[1]  Clinton was also treated at the Veterans Affairs Hospital by Drs. Dunamalyan, McCoy, and Jones for pain in his knees and right shoulder and by his family practice physician, Dr. Timothy Donelan.

at Sanford Orthopedics & Sports Clinic. Clinton informed Dr. Walker that he had been experiencing knee pain since the accident. Dr. Walker diagnosed Clinton with IT band subluxation and recommended total knee replacement surgery. Clinton had the surgery on February 14, 2011. Following surgery, Clinton attended physical therapy until March 31, 2011, when his physical therapist noted that he had "met all short and long term goals" and discharged him at that time. Docket 23-4 at 123.

Clinton still has lingering aches and pain in his knee and struggles walking normally. He was forced to give up his lawn mowing business and his part-time employment at Miller Funeral Home because of his knee issues. He also continues to have neck and back issues.

Beverly was also injured in the accident. Beverly had a total knee replacement just before the accident, and the accident interfered with her recovery. On September 1, 2010, a week after the accident, Beverly met with Dr. Walker—the doctor who performed her knee replacement surgery—and learned that the accident caused her knee to swell. Dr. Walker instructed her to increase her activity and continue with her physical therapy.

Beverley also treated with Dr. Sauer at Empire Chiropractic from August 27, 2010, until January 5, 2011, to alleviate neck, back, and shoulder pain. Notes from Beverly's last chiropractic visit on January 5, 2011, indicate that she "reported feeling much better, with very little soreness or discomfort at all over the past 2

weeks. . . . She is to continue home stretches and heat as needed, and return for treatment as needed if she has any further trouble." Docket 23-5 at 18. She did not return for any treatment.

In addition to chiropractic care, Beverly did physical therapy at Avera McKennan Therapy Clinic from August 31, 2010, through January 6, 2011, to strengthen her neck, back, shoulder, and knee. Notes from her last physical therapy session on January 6, 2011, indicate that she was doing well and that she could continue her therapy from home. Docket 23-5 at 46. She did not return for additional physical therapy.

Beverly still struggles maintaining any type of activity for any significant amount of time. For example, she can only bake one batch of cookies whereas she used to have the stamina to bake two.

Beverly has also struggled with post-traumatic stress disorder following the accident. She is often nervous when riding in cars, and she no longer drives herself.

## II.    Claims Handling

As noted above, Western National was notified of the accident the day it happened, August 24, 2010. Jackie Dekker was initially assigned to monitor the claim. Dekker requested signed medical authorizations and began a medical investigation. Meanwhile, medical bills were paid as received until the limits of the

4

medical pay coverage for both Clinton and Beverly were exhausted in late 2010 and May 2011.

In September 2011, Lewisons' legal counsel, Scott Abdallah, notified Western National that West's policy limits were $25,000 per person. On October 26, 2011, John Buckley, Western National's Director of Legal Services, took over the Lewison file because Western National had recently been sued by Abdallah on two separate occasions.

In November 2011, Western National received a *Schmidt* notice from Abdallah. In this notice, Abdallah informed Western National that a tentative settlement was reached with West's insurance company in which the insurance company would pay $25,000 to both Clinton and Beverly. The settlement was contingent upon Western National's approval and waiver of any subrogation claim against West. On December 8, 2011, Western National advised Abdallah that the Lewisons were free to agree to the settlement with West's insurance company. So they did.

In anticipation of underinsured motorist (UIM) claims from the Lewisons, Buckley retained a Sioux Falls, South Dakota, attorney, Douglas Deibert, in January 2012, to assist him in scheduling examinations under oath and independent medical examinations (IME) of the Lewisons. A few days later, Western National received a

claim for UIM benefits from the Lewisons. Clinton and Beverly both sought the policy limit of $75,000.

In response to Abdallah's demand letter, Buckley drafted a letter to Abdallah requesting Abdallah provide him a list of medical care professionals with whom the Lewisons treated for the time period spanning 10 years before the accident so that he could further conduct his investigation. Buckley also stated that he intended to schedule examinations under oath and IMEs of both Clinton and Beverly. Abdallah responded with accusations of bad faith, claiming Buckley's desires to examine the Lewisons under oath and to have them undergo IMEs was bad faith conduct. Following a few heated letters back and forth between Abdallah and Buckley, the parties were able to schedule IMEs of Clinton and Beverly.[2] Buckley noted that a major reason for conducting IMEs was because he had concerns that Clinton's knee surgery arose out of a preexisting condition and was not caused by the accident.

Dr. David Hoversten, an orthopedic surgeon in Sioux Falls, South Dakota, was recommended by Deibert to perform the IMEs. Buckley made arrangements for Dr. Hoversten to perform the IMEs in April 2012. Before the IMEs were scheduled to take place, Buckley sent Dr. Hoversten the Lewisons' medical files as well as a letter detailing the issues he wanted Dr. Hoversten to cover in the IME

---

[2] Buckley ultimately did not schedule examinations under oath after Abdallah refused to have his clients subjected to the same.

6

report. In this letter, Buckley provided his own brief summary detailing the

Lewisons' medical treatments. In summarizing Clinton's medical treatments,

Buckley wrote:

> The next treatment Mr. Lewison received was at Empire Chiropractic
> on August 27, 2010. He reported having neck pain, right upper back
> pain, right shoulder pain, low back, right buttock and right hip pain.
> He also had a headache with neck and back stiffness, tightness, and
> sore muscles. Finally, he reported left medial knee pain. According to
> Mr. Lewison, the symptoms started after the August 24, 2010 motor
> vehicle accident.

Docket 23-7 at 34. Dr. Hoversten conducted the IMEs on April 17, 2012.

> Following the IMEs, Dr. Hoversten prepared reports detailing his opinions.

With regard to Clinton, Dr. Hoversten stated:

> I think he sustained a sprain/strain complex to his neck, his midback,
> and his low back, and he had a strain to his right shoulder. He
> probably had a little strain to his left knee. In my opinion these were
> all minor of soft tissue only. It is particularly important to note that
> Mr. Lewison was not complaining of his knee the next day when he
> saw Dr. Donelan [sic], no ex-rays were obtained; in fact, it was not
> until approximately two or three months later that complaints of the
> left knee surfaced, and it was not until four months later when he saw
> Dr. Walker that a claim that the left knee had been injured and hurt
> developed.

Docket 23-7 at 42. Ultimately, Dr. Hoversten concluded that Clinton would have

needed the knee surgery in any event, and therefore, the accident did not cause it.

He also opined that Clinton had fully recovered from all of the injuries caused by

the accident and that any current symptoms arose from preexisting conditions.

With regard to Beverly, Dr. Hoversten opined that she had soft tissue sprains/strains of her spine and knee. Further, Dr. Hoversten stated that Beverly's "recovery was excellent as predicted. The inability to walk is unexplainable by any injuries or any findings today. . . . I am also at a loss as to why she cannot resume most all of her normal activities at this time." Docket 23-7 at 48. He concluded by opining that he believed she had returned to her pre-accident status.

After receiving Dr. Hoversten's IME reports and in light of the Lewisons' medical records, Buckley made the decision to deny the Lewisons' claims in full. In his denial letter to Clinton, Buckley parroted Dr. Hoversten's conclusions, including that it was unlikely that the knee surgery was brought on by the accident because Clinton did not immediately complain of pain in his left knee. Buckley noted that Clinton received $5,000 in medical payments from Western National and $25,000 from the settlement with West's insurance company. According to the demand letter, Clinton incurred $69,775 in medical bills, at least $53,750 of which was related to the knee surgery. Buckley believed that the $16,025 in bills, which were not related to the knee surgery, were easily covered by the $30,000 Clinton had already received. Thus, his UIM claim was denied.

Buckley also sent a denial letter to Beverly. Buckley stated that he believed Beverly had recovered from all of the injuries she sustained in the accident. According to the demand letter, she incurred $12,312.13 in medical bills, $1,730.52

8

for prejudgment interest, and $207.63 for mileage to/from medical appointments. Buckley believed the $30,000 that she received ($25,000 from the settlement and $5,000 from Western National's medical payment coverage) was sufficient to cover the entirety of the damages she suffered from the accident.

The Lewisons sued Western National for breach of contract on June 12, 2012. Dr. Hoversten was deposed during discovery, and Western National's counsel advised Buckley that Dr. Hoversten had been a weak witness with testimony casting doubt on the integrity of his previously stated opinions. The parties then participated in a mediation session in February 2013. They reached an agreement in which Western National paid Clinton the limits of his UIM coverage, $75,000, and paid Beverly $30,000 on her claim. Plaintiffs then brought this bad faith lawsuit on April 9, 2013.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of her case on which she bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere

9

allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)).

Summary judgment is precluded if there is a dispute in facts that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For purposes of a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## DISCUSSION

Western National argues summary judgment is appropriate on plaintiffs' bad faith claims because its decision to deny plaintiffs' UIM claims was made in good faith. Plaintiffs, on the other hand, argue that there are questions of material fact as to whether Western National acted in bad faith when it denied their claims.

The South Dakota Supreme Court[3] articulated the test for whether summary judgment is appropriate in a first-party bad faith claim in *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623 (S.D. 2009).

> [T]here must be an absence of a reasonable basis for denial of policy benefits or failure to comply with a duty under the insurance contract and the knowledge or reckless disregard of the lack of a reasonable

_____

[3] The parties agree that South Dakota law applies to this action.

> basis for denial, implicit in that test is our conclusion that the knowledge of the lack of a reasonable basis may be inferred and imputed to an insurance company where there is a reckless disregard of a lack of reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured.
>
> Under these tests of the tort of bad faith, an insurance company, however, may challenge claims which are fairly debatable and will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.

*Id.* at 629 (quoting *Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70 (S.D. 1996)).

First-party bad faith is an intentional tort and occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits. *Hein v. Acuity*, 731 N.W.2d 231, 235 (S.D. 2007). But if an insured's claim is fairly debatable either in fact or law, an insurer cannot be said to have denied the claim in bad faith. *Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 630. "The questions of whether the insurer's actions were unreasonable or whether the claim was fairly debatable must be viewed at the time the insurer made the decision to deny or litigate the claim, rather than pay it." *Id.* "The question of whether an insurer has acted in bad faith is generally a question of fact." *Bertelsen v. Allstate Ins. Co.*, 833 N.W.2d 545, 554 (S.D. 2013).

Western National claims that it performed a thorough and reasonable investigation and after such investigation, reasonably determined that plaintiffs were not entitled to UIM benefits and denied their claims for the same. At worst,

Western National claims that whether plaintiffs were entitled to UIM benefits was fairly debatable at the time it denied plaintiffs' UIM claims.

Plaintiffs submit that there is a question of fact as to whether Western National, through Buckley, acted intentionally or recklessly when denying plaintiffs' UIM claims. Specifically, plaintiffs argue that Buckley's statement—that "Mr. Lewison's first complaint of left knee pain following the accident was on December 22, 2010"—in his May 21, 2012, letter in which he notified plaintiffs that Clinton's UIM claim was denied is evidence that Western National acted in bad faith because the statement was clearly erroneous. Moreover, plaintiffs take issue with Western National's attempts to conduct examinations under oath of plaintiffs as well as Western National's failure to conduct any type of interview following the IMEs. Plaintiffs also note that Western National never spoke to Beverly's treating physicians. Lastly, plaintiffs argue that Western National's lack of official policies regarding claims handling is further evidence of bad faith that creates a jury question.

Because there are two separate bad faith claims involved here—one pertaining to Clinton's UIM claim and the other pertaining to Beverly's UIM claim—the court analyzes them separately, starting with Clinton's bad faith claim.

12

## I.      Count 1–Clinton's Bad Faith Claim

The biggest point of contention between the parties relating to Clinton's claim revolved around whether Clinton's total knee replacement surgery was necessitated by injuries stemming from the accident. Western National admitted that Clinton was entitled to the full amount of his UIM benefits, namely $75,000, if the accident was the cause of the knee surgery. On the other hand, if the knee surgery was not brought on by the accident, then Western National claims no UIM benefits were due because Clinton was fully compensated by the $25,000 settlement with West's insurer and its $5,000 medical payment. Western National denied Clinton's claim in full on May 21, 2012. Therefore, in the bad faith context, the question becomes whether Western National had a reasonable basis for denying Clinton's claim, or stated alternatively, whether Western National had a reasonable basis for believing Clinton's knee surgery was not causally related to the accident. *See Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 629 (noting that an insurance company "will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis").

Western National set out its reasons for denying Clinton's claim in its May 21, 2012, letter. In this letter, Western National stated, "Mr. Lewison's first complaint of left knee pain following the accident was on December 22, 2010. . . . Mr. Lewison had a well documented valgus arthritis deformity as a result

13

of the progressive loss of his joint space caused by arthritic deterioration of the knee. This was not an acute injury of the knee and was not caused by the car accident." Docket 23-7 at 50. Western National relied heavily on Dr. Hoversten's conclusions following Clinton's IME in determining that the knee injury was not caused by the accident and, ultimately, in deciding to deny benefits.

Dr. Hoversten sent Western National a letter dated April 17, 2012, in which he provided his medical opinions following the IME of Clinton. Docket 23-7 at 39. In this letter, Dr. Hoversten concluded that Clinton's knee surgery was not brought on by the accident but instead stemmed from a condition that existed prior to the accident. In coming to this conclusion, Dr. Hoversten stated, "It is particularly important to note that Mr. Lewison was not complaining of his knee the next day when he saw Dr. Donelan, no x-rays were obtained; in fact, it was not until approximately two or three months later that complaints of the left knee surfaced, and it was not until four months later when he saw Dr. Walker that a claim that the left knee had been injured and hurt developed." Docket 23-7 at 42. The medical records show that this statement by Dr. Hoversten is false. Clinton complained of knee pain on August 27, 2010, just three days after the accident, and stated that the pain started after the accident. Docket 23-4 at 15. Clinton again complained of knee pain on August 30, 2010. Docket 23-4 at 16. The medical records also suggest that Clinton received physical therapy in an attempt to resolve his knee pain, starting

14

therapy on October 13, 2010. Docket 23-4 at 66. Thus, Dr. Hoversten formed his opinions based on incorrect information.

As noted above, Western National essentially mimicked Dr. Hoversten's opinions in its denial letter, implying that Clinton's delayed complaints about his knee was a significant factor in deciding that the knee surgery was not caused by the accident. Western National relied on this information despite the fact that it had a copy of Clinton's medical records and knew that Clinton complained of knee pain three days after the accident and received physical therapy for his knee starting in October 2010. Indeed, in its request for the IME, Western National told Dr. Hoversten that Clinton complained of knee pain on August 27, 2010, and that "[a]ccording to Mr. Lewison, the symptoms started after the August 24, 2010 motor vehicle accident." Docket 23-7 at 34. Thus, Western National relied, at least in part, on something that it knew to be false when it denied Clinton's claim.

Western National argues that Buckley simply made a mistake when drafting the denial letter and would have denied the claim either way. Plaintiffs argue that it was an intentional attempt to use Dr. Hoversten's false statement as a means of denying Clinton's claim. Denying a claim for reasons known to be false is not a reasonable basis to deny a claim. Therefore, accepting plaintiffs' version of the facts as true, there is a triable issue of fact on whether Western National had a reasonable

15

basis for believing Clinton's knee surgery was not causally related to the accident. Thus, summary judgment is denied on Clinton's bad faith claim.

## II.     Count 2–Beverly's Bad Faith Claim

Beverly claims the car accident caused her significant damages. The accident aggravated the recovery from her recent knee replacement surgery, caused her neck, back, and shoulder pain, and resulted in nervousness and stress. To get relief from her physical symptoms, Beverly received chiropractic treatment from August 27, 2010, through January 5, 2011, and physical therapy from August 31, 2010, until January 6, 2011. Although her pain persists and her daily activities have been limited, she no longer receives medical attention. In plaintiffs' demand letter, it is asserted that Beverly sustained $12,312.13 for past medical expenses, $1,730.52 for prejudgment interest, $207.63 for mileage to/from medical appointments, $250,000 for loss of consortium, and $500,000 for pain, suffering, and loss of enjoyment of life. Docket 15-4 at 10.

After a review of Beverly's medical records and Dr. Hoversten's IME, Western National denied Beverly's UIM claim. Beverly had already received $25,000 from West's insurance provider and an additional $5,000 from Western National. She was no longer receiving medical attention. Dr. Hoversten stated that "her recovery was excellent as predicted" and that he is "at a loss as to why she cannot resume most all of her normal activities at this time." Docket 23-7 at 48.

16

Dr. Hoversten opined that Beverly "has recovered back to her preexisting status and has no permanent residuals from it at this time." *Id.* Western National took the position that Beverly had "been fully compensated by the underlying settlement." Docket 23-7 at 54.

   An insurer cannot be said to have denied the claim in bad faith if the claim is fairly debatable. *Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 630. At the time Western National denied Beverly's UIM claim, she had received $30,000 in insurance proceeds. Beverly incurred $12,312.13 in medical expenses related to ailments from the accident. After deducting her medical expenses and her claims of $1,730.52 for prejudgment interest and $207.63 for mileage to/from medical appointments, Beverly received $15,749.72 in damages. Notes from Beverly's last chiropractic visit on January 5, 2011, stated she "reported feeling much better, with very little soreness or discomfort at all over the past 2 weeks. . . . She is to continue home stretches and heat as needed, and return for treatment as needed if she has any further trouble." Docket 23-5 at 18. She did not return for any treatment. Notes from her last physical therapy session on January 6, 2011, also indicated that she was doing well and noted she could continue her therapy from home. Docket 23-5 at 46. She did not return for additional physical therapy. Moreover, Western National's IME concluded Beverly did not suffer any permanent injuries from the accident and had a full recovery. Based on this information, the court finds that

17

whether Beverly was entitled to UIM benefits was fairly debatable at the time Western National denied her claim.

Plaintiffs argue Western National's request to conduct an examination under oath is evidence of bad faith. Plaintiffs' policy, however, provides that an insured seeking coverage must submit to examination under oath and subscribe when requested by the insurer. Docket 22-7 at 21. Plaintiffs fail to identify South Dakota case law that states requesting an insured to submit to an examination under oath as part of a coverage investigation is evidence of bad faith. *C.f. Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 629 ("The issue is determined based upon the facts and *law* available to the insurer at the time it made the decision to deny coverage.") (emphasis added). Thus, based on the law available to the insurer at the time, Western National's request to conduct an examination under oath is not sufficient evidence alone to show bad faith.

Plaintiffs also take issue with Western National's failure to interview Beverly before denying her claim. But plaintiffs' counsel appears to be a major reason why Western National never obtained an interview. In response to Western National's request for an examination under oath, plaintiffs' counsel accused Western National of bad faith conduct and refused to agree to an examination under oath. Following plaintiffs' counsel's bad faith accusation, the tone of the communications between the parties became very confrontational and they were unable to agree to terms of

an interview, despite the aforementioned contract terms. Western National's conduct under these circumstances is not evidence of bad faith.

Another contention by plaintiffs is that Buckley should have spoken with Beverly's treating physicians. Buckley, however, had total access to Beverly's medical records. The medical records indicate that Beverly was doing well when she stopped receiving treatment. The notes from both her chiropractor and physical therapist state she was feeling much better and should only continue treatment if she believed it was needed. She never returned for treatment. Dr. Hoversten also opined that Beverly had a full recovery. Under these facts, failing to speak with the insured's treating physicians is not evidence of bad faith. While a reasonable investigation is required, a perfect one is not. *Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 629-30

Finally, plaintiffs take issue with Western National's failure to have policies in place to ensure a prompt and reasonable investigation. Plaintiffs point to SDCL 58-33-67(1), which requires insurers to "adopt and adhere to reasonable standards for the prompt investigations of . . . claims." The same argument was addressed in *Anderson v. W. Nat'l Mut. Ins. Co.*, 857 F. Supp. 2d 896, 908 (D.S.D. 2012). Judge Lange concluded:

> The tort of bad faith in South Dakota focuses on whether or not the insurer had a reasonable basis for denying benefits under the policy and whether the insurer knew or recklessly disregarded the lack of a

19

> reasonable basis in denying the claim. A violation of SDCL 58-33-67(1)—a provision that is focused on the adoption of reasonable standards to provide for the timely investigation of claims—does not prove either prong of the South Dakota bad faith test. . . . Western National's alleged violation of SDCL 58-33-67(1) is not a material fact that prevents the court from granting summary judgment on Anderson's bad faith claim when the question of Anderson's entitlement to more than the $100,000 UIM limit is fairly debatable as a matter of law.

*Id.* at 908. The facts are the same here. Whether Beverly was entitled to UIM benefits was fairly debatable. Thus, Western National's purported noncompliance with SDCL 58-33-67(1) is not a material fact that prevents summary judgment.

In sum, whether Beverly was entitled to UIM benefits was fairly debatable when Western National denied her claim. An insurer cannot be said to have denied the claim in bad faith if the claim was fairly debatable. *Dakota, Minn. & E. R.R. Corp.*, 771 N.W.2d at 630. And while a reasonable investigation into an insured's claim is required, plaintiffs' arguments imply that Western National was required to perform a perfect investigation. Such is not the law in South Dakota. Western National's investigation into Beverly's claim, while not perfect, was reasonable. Thus, Western National is entitled to summary judgment on Beverly's bad faith claim.

## CONCLUSION

Western National moves for summary judgment on two separate bad faith claims. Plaintiffs put forth sufficient evidence to show that there is a genuine issue

of material fact as to whether Western National conducted a reasonable investigation when investigating Clinton's UIM claim and whether Clinton's UIM claim was fairly debatable at the time Western National denied such claim. With regard to Beverly's bad faith claim, the undisputed facts establish that Beverly's claim for UIM benefits was fairly debatable when Western National denied her claim. Western National is entitled to summary judgment on Beverly's bad faith claim. Accordingly, it is

ORDERED that Western National's motion for summary judgment (Docket 17) is granted in part and denied in part.

Dated July 21, 2014.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

21